# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| NASHVILLE COMMUNICATIONS, INC., | ) ) ) | |
| Plaintiff, | ) ) | Case No. 3:24-cv-01020 |
| v. | ) ) | Judge Aleta A. Trauger |
| AUTO-OWNERS (MUTUAL) INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM

Before the court are cross-Motions for Partial Summary Judgment. For the reasons set forth herein, the plaintiff's motion (Doc. No. 30) will be granted, and the defendant's motion (Doc. No. 28) will be granted in part and denied in part.

## I.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

By its very terms, Rule 56 anticipates "that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.* at 248.

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at 255; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id.*

The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Ferro Corp. v. Cookson Grp., PLC*, 585 F.3d 946, 949 (6th Cir. 2009); *Taft Broad. Co. v. United States*, 929 F.2d 240, 241 (6th Cir. 1991). On cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft*, 929 F.2d at 248.

## II.     FACTS

This lawsuit concerns coverage for damage to property owned by plaintiff Nashville Communications, Inc. ("NashComm") and insured by Auto-Owners (Mutual) Insurance Company

("Auto-Owners"). While the parties' interpretations of the facts relevant to the dispute differ, the operative facts in this case, as set forth below, are basically undisputed.[1]

### A. The Policy

Auto-Owners issued Policy No. 194619-80173260-22 (the "Policy") to NashComm with a term of May 29, 2022 to May 29, 2023. (Doc. No. 8-1 at 7.)[2] The Policy insured NashComm's commercial building, located at 330 Plus Park Boulevard, Nashville, Tennessee 37217, as Location 0001 – Building 0001 (the "Building" or the "Property"). (*See id.* at 9, 15.)

The applicable "Coverage" provision of the Policy states in relevant part:

<strong>BUILDING AND PERSONAL PROPERTY<br>COVERAGE FORM</strong>

. . . .

**A. COVERAGE**

We will pay for direct physical loss of or damage to the Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

**1. Covered Property**

Covered Property, as used in this Coverage Part, means the type of property described in Section A.1., and limited in A.2., Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

    a. **Building**, meaning the building or structure described in the Declarations . . . .

(*Id.* at 71.)

---

[1] The facts for which no citation is provided are derived either from the plaintiff's Response to the Defendant's Statement of Undisputed Facts ("DSUMF") (Doc. No. 40) or the defendant's Response to the Plaintiff's Statement of Undisputed Facts ("PSUMF") (Doc. No. 37) and are undisputed, at least for purposes of summary judgment.

[2] The Policy is in the record in multiple locations, and the parties cite it differently. The plaintiff cites the PDF pagination of its "Exhibit 2." The defendant cites the CM/ECF-assigned PageID#. The court finds that both of these methods make it difficult to find the cited page and cites the Policy filed at Doc. No. 8-1 by the document page numbers assigned by the CM/ECF system.

In the same Building and Personal Property Coverage Form, the Policy contains a provision ("Appraisal Provision"), which sets out the procedure for resolving a dispute between Auto-Owners and an insured regarding "the value of the property or the amount of loss," as follows:

**E. LOSS CONDITIONS**

. . . .

**2. Appraisal**

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. . . . The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. . . .

If there is an appraisal, we will still retain our right to deny the claim.

(*Id.* at 79.)

The Policy defines "Covered Causes of Loss" as follows:

**CAUSES OF LOSS – SPECIAL FORM**

**A. COVERED CAUSES OF LOSS**

When Special is shown in the Declarations, Covered Causes of Loss means Risks of Direct Physical Loss unless the loss is:

1. Excluded in Section B., Exclusions; or

2. Limited in Section C., Limitations that follow.

(*Id.* at 94.)

Regarding exclusions and limitations, the Policy contains the following potentially relevant provisions:

**B. EXCLUSIONS**

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

. . . .

**g. Water**

(1) Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

(2) Mudslide or mudflow;

(3) Water that backs up or overflows or is otherwise

discharged from a sewer, drain, sump, sump pump or related equipment;

(4) Water under the ground surface pressing on, or flowing or seeping through:

(a) Foundations, walls, floors or paved surfaces;

(b) Basements, whether paved or not; or

(c) Doors, windows or other openings . . . .

. . . .

2. We will not pay for loss or damage caused by or resulting from any of the following:

. . . .

d.(1) Wear and tear[.]

. . . .

f. Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

. . . .

**C. LIMITATIONS**

The following limitations apply to all Policy forms and endorsements, unless otherwise stated.

1. We will not pay for loss of or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.

. . . .

      c. The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

          (1) The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

          (2) The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

(*Id.* at 94–96, 98.)

It is undisputed that wind is a covered cause of loss under the Policy, subject to Policy exclusions and limitations. (*See* Doc. No. 32-1 at 4, Walker 30(b)(6) Dep. 17.)

## B.    The Covered Event

On March 3, 2023, a windstorm (the "wind event") struck the Building, resulting in damage (the "Loss"). The Loss occurred during the Policy term. On March 6, 2023, NashComm reported wind damage to Auto-Owners resulting from the wind event and submitted a claim to Auto-Owners for coverage under the Policy of the Loss, including damage to the roof and interior water leakage. Auto-Owners acknowledged that there was some amount of wind damage to the Building from the wind event.

## C.    The Appraisal Process

Auto-Owners initially took the position that the "wind damage from the Loss was limited to displacement of one section of rubberized membrane covering the parapet wall along the north roof edge and one metal joint covering the east parapet wall." (Doc. No. 32-3 at 2, Def.'s Answer to Pl.'s Interrog. No. 10.) Auto-Owners' engineer also determined that any "water intrusion through the roof was due to general aging of the roof membrane and failing sealant, which resulted in widespread deterioration-related openings throughout the roof surface and was not attributable to wind or hail." (*Id.* at 2–3.) Auto-Owners estimated the amount of loss to the Property caused by the wind event to be $2,204.75. (Doc. No. 38-1 at 2, Def.'s Am. Answer to Pl.'s Interrog. No. 12.)

Auto-Owners offered coverage to NashComm based upon its estimate of the actual cash value ("ACV") of the Loss.

NashComm disagreed with Auto-Owners as to the "amount of loss"[3] and, accordingly, invoked the Policy's Appraisal Provision. (*See* Doc. No. 33-5, Demand for Appraisal; *see also* Doc. No. 8 ¶ 14.)[4] Auto-Owners responded to the Demand for Appraisal by letter dated September 18, 2023, reiterating its position that the only observable wind damage was to "approx. 12ft of membrane cap on the parapet wall which is reparable," that there was no other "wind / hail / tree or other damage" to the roof from a "covered cause of loss," and that Auto-Owners' "position on the amount of damage[] sustained in the loss remains unchanged." (Doc. No. 33-6 at 1.) It nonetheless accepted the demand for appraisal, while stipulating that it was "only agreeing to appraise the amount of loss to the roof of your structure due to the loss on March 3rd, 2023 storm [sic]. These are the only items that will be considered as part of the covered loss under the policy. . . . Any coverage issues or non-damaged items will not be considered." (*Id.*)

In accordance with the procedure set forth in the Appraisal Provision, Auto-Owners selected Paul Vitolins as its appraiser; NashComm selected Zachary Baker as its appraiser; and the two appraisers selected Stuart McDiarmid as their umpire. Baker and Vitolins both inspected the roof and performed appraisals to estimate the cost of repairing the storm damage. It appears to be undisputed for purposes of both parties' Motions for Summary Judgment that the two appraisers understood that it was not their role to assess exactly what damage to the roof was caused by the

---

[3] The plaintiff's damages position at that time is not set forth in the parties' fact statements, but the plaintiff apparently maintained that, contrary to Auto-Owners' engineer's assessment, the wind event caused extensive damage to the entire roof. (*See* Doc. No. 39-1, Prosser & Assocs. Storm Damage Inspection Report at 3, 9–10.)

[4] In its Response to the DSUMF ¶ 10, NashComm states that this fact is undisputed for purpose of summary judgment only. The court has difficulty fathoming in what context this statement might be disputed. The crux of the present motions is the parties' disagreement as to the amount of loss and the plaintiff's invocation of the Appraisal Provision.

wind event or to assess the extent to which the entire roof was damaged (by the wind event or other cause). Rather, they accepted Auto-Owners' initial assessment that the only direct storm damage was to the "approx. 12ft of membrane cap on parapet wall" that runs the perimeter of the Building. (*See* Doc. No. 33-7 at 4, Baker Dep. 13 ("My position on what has suffered direct physical loss . . . is derived from what the carrier has determined is direct physical loss. And then I build my scope and my appraisal of damages based on the causal elements they have established."); Doc. No. 32-6 at 3, Baker Dep. 22 ("Q. Did you ever develop any opinions that something other than what the carrier conceded was direct physical loss actually suffered direct physical loss? A. I didn't consider it."); Doc. No. 38-2 at 3, Baker Dep. 23 ("[W]e are there not to determine cause or coverage but the means and methodology of the scope [of repair] as a direct result of what the carrier has determined was damaged. And that's what we were doing."); Doc. No. 33-9, Vitolins Appraisal (addressing repair of parapet wall).)

Vitolins' appraisal of the total amount of the Loss was $2,204.75. This figure was limited to that portion of the damage to the roof that Auto-Owners agreed was related to the wind event— *i.e.*, the cost to repair the "cap flashing on north portion of parapet wall" and to "resecure metal joint cover on the east parapet." (Doc. No. 33-9.) Baker's appraisal is not in the record, but he apparently disagreed, thus triggering the need for the umpire to resolve the disagreement. On April 30, 2024, the umpire, joined by Baker, issued an Appraisal Award of $187,469.10, which includes the cost to replace the entire roof of the Building. (Doc. No. 33-10.) According to the Appraisal Award, this figure represents the "Total Amount of Loss" minus depreciation, yielding the "Actual Cash Value of Loss." (*Id.*)

MacDiarmid explained the rationale for his decision in an email he sent to the two appraisers along with his repair estimate and the Appraisal Award, as follows:

> I have to admit, this one was difficult for me. While the roof is certainly in poor
> condition and much of the moisture to the roof is likely due to maintenance issues,

I could not ignore the 2 areas which had agreed wind damage and were allowing water intrusion to the interior. With that, the moisture has to pass through the roofing system to get to the inside of the building. After the thermography report, it was very clear that the areas at the agreed wind damage were indeed wet and with the current condition of the roof, attempted repairs would lead to a domino effect of damaging the surrounding materials while attempting to manipulate. The other option would have been a partial replacement of the roof, but that would have left migrating moisture to seep back into the new materials and certainly would not be pre-loss condition. I thought you both might like to know my thought process.

(Doc. No. 33-11.) MacDiarmid further attests in a Declaration his understanding that, as umpire, he, in conjunction with the appraisers, was "tasked with determining the amount of loss to the Property following a storm event that occurred on or about March 3, 2023." (Doc. No. 32-5, MacDiarmid Decl. ¶ 4.) According to MacDiarmid:

> 5.   In my determination of the amount of the loss, I considered only the scope of damage that Owners agreed had sustained damage, and I determined the necessary means and methods of repairing the same.
>
> . . . .
>
> 7.   My email dated April 30, 2024 provides an explanation as to how I arrived at my determination as to the amount of loss, which did not include any considerations of insurance policy coverage or cause of loss determinations.
>
> 8.   I did not engage in any considerations of policy coverage or liability as part of the appraisal.
>
> 9.   I did not engage in any cause of loss determinations as part of the appraisal.

(*Id.* ¶¶ 5, 7–9.)

Vitolins emailed Baker and MacDiarmid to "go on record as to [his] disagreement with the decision to replace the roof and why." (Doc. No. 33-12.) He explained his understanding that Auto-Owners had "extend[ed] coverage, but only for the parapet wall covering," which Vitolins believed was "rather insignificant to the roof itself and the moisture survey does not support related water intrusion to the roof system." (*Id.*) Because he believed that the damage to the parapet was "not integral to the roof system itself," he did not agree that replacement of the roof as a whole was warranted, and he further noted findings by an engineer retained by Auto-Owners, who found that

the roof had "long exceeded its serviceable life" and concluded that roof leaks following the storm were not caused by the storm or the "displaced membrane and the parapet wall or displaced metal joint covering the parapet wall on the east edge of the roof," which were caused by the storm. (*Id.*) Specifically, Vitolins disagreed with MacDiarmid's conclusion that "the moisture has to pass through the roofing system to get to the inside of the building," because Vitolins believed that "moisture can enter the gap between the roof and the parapet wall with or without the parapet covering and without passing through the roof system, in both locations of parapet covering damage and at almost any point around the perimeter of the roof structure." (*Id.*)

## D. Auto-Owners' Refusal of the Appraisal Award

NashComm requested that Auto-Owners make payment in accordance with the Appraisal Award. Auto-Owners disputed the Appraisal Award and declined to pay for a full roof replacement, reasserting its original coverage position and stating that the umpire exceeded his authority in the appraisal process, specifically by "improperly consider[ing] causation of the loss in determining the award." (Doc. No. 33-13 at 2.) In its letter responding to the Appraisal Award, Auto-Owners emphasized the last sentence of the Appraisal Provision in the Policy, pursuant to which Auto-Owners retained its right to "deny the claim" even if it was submitted to an appraisal. (*Id.* at 1.)[5] Auto-Owners stated:

> Per the policy language above, there is no evidence in this case there was damage to roof or exterior elevations from a "covered cause of loss." The policy language cited above, specifically C(1)(c), requires first an opening in the roof or exterior elevations created by a "covered cause of loss" for coverage to extend to the interior of the structure for water damage. Here, unfortunately, it seems the appraisal panel improperly evaluated causation based on thermal imaging that showed some water

---

[5] The letter also sets forth verbatim several provisions of the Policy, including many of those cited above: the "Coverage" provision, the "Water" Exclusion, and the "Limitations" provision. (Doc. No. 33-13 at 3–4.) Auto-Owners' Rule 30(b)(6) representative acknowledged during his deposition, however, that the Water Exclusion did not apply to NashComm's claim and had "no opinion" as to whether the Building suffered damage due to snow or ice melt. (Doc. No. 32-1 at 15, 11, Walker 30(b)(6) Dep. 59, 48.)

present in the roof structure. There is no evidence that the presence of water was caused by a "covered cause of loss" as required by the policy.

. . . . As described above, our engineer determined the water intrusion through the roof was the result of general aging of the roof membrane and failing sealant, not from a "covered cause of loss" and as such, we respectfully deny coverage for the appraisal award as the panel improperly evaluated causation contrary to the engineering evidence.

(*Id.* at 4.)

Auto-Owners' Rule 30(b)(6) witness conceded, during his deposition, that he could not point to any "coverage or causation determinations that were made in the appraisal award." (Doc. No. 32-1 at 13, Walker 30(b)(6) Dep. 50.) Vitolins agreed that an appraisal panel should not "make coverage decisions" but that it is the appraisal panel's job to "determine the proper means and methods of repair" and to "determine the scope of the damage that they are appraising." (Doc. No. 32-7 at 3, Vitolins Dep. 79.)

On June 11, 2024, NashComm's counsel sent a letter to Auto-Owners with a formal demand for payment of the Appraisal Award amount, pursuant to Tenn. Code Ann. § 57-7-105, and giving notice of its "intent to assert a cause of action for bad faith if this claim is not paid in full." (Doc. No. 33-14 at 5.) This lawsuit was filed on August 21, 2024. (*See* Doc. No. 1.)[6]

## III.   PROCEDURAL HISTORY

NashComm's Amended Complaint asserts claims for breach of contract and statutory bad faith, under Tenn. Code Ann. § 56-7-105, based on Auto-Owners' refusal to pay the full cost of repairing the damages to the Building. NashComm seeks compensatory and punitive damages, as well as the 25% bad faith penalty. (Doc. No. 8.) Auto-Owners filed an Answer (Doc. No. 12), admitting that a wind storm damaged NashComm's insured Building, giving rise to a covered loss.

---

[6] The plaintiff originally filed suit on August 21, 2024 (Doc. No. 1) and then filed an Amended Complaint on August 26, 2024 (Doc. No. 8), correcting the defendant's name and attaching a copy of the underlying insurance policy.

It maintains, however, that a dispute between the parties exists as to causation and coverage, rather than merely a dispute about the amount of loss (monetary value of covered damages), and it denies breaching the contract or engaging in bad faith.

Each party filed a motion seeking partial summary judgment in its favor in August 2025. Both have filed supporting Memoranda of Law, Statements of Undisputed Material Facts, Responses to the opposing party's statements and motions, Reply briefs in further support of their own, and evidentiary material they believe supports their position. In addition, Auto-Owners filed a Statement of Undisputed Material Facts in Support of its Response to Plaintiff's Motion for Partial Summary Judgment. (Doc. No. 38.) Although this court's Local Rules formerly authorized a party opposing summary judgment to file of a statement of additional facts that the party believed created a material factual dispute precluding summary judgment, that provision was eliminated in the May 2025 amendments to the Local Rules. *See* L.R. 56.01(e) (eff. May 15, 2025) (available at https://www.tnmd.uscourts.gov/court-info/local-rules-and-orders/local-rules). In other words, a party opposing summary judgment is no longer authorized to file a separate statement of facts, and, in any event, the Local Rules never authorized a party opposing summary judgment to file a separate statement of additional *undisputed* facts in support of that party's opposition to summary judgment. The plaintiff filed Objections to the defendant's statement of additional facts, asking the court to exercise its discretion to disregard the filing in its entirety. (Doc. No. 43.) In the alternative, and in an abundance of caution, the plaintiff also responded to the additional facts.

The court finds that the defendant's improper statement of additional facts largely reiterates facts raised elsewhere in the parties' briefing—or that could and should have been set forth in support of Auto-Owners' own motion—and adds little to the factual landscape. The statement is both unnecessary and redundant, aside from being unauthorized by the Local Rules. The court,

therefore, in the exercise of its discretion, declines to take the document into consideration in addressing either party's motion.

## IV. THE MOTIONS FOR PARTIAL SUMMARY JUDGMENT

NashComm's motion asks the court to find that the Appraisal Award is "binding and enforceable" and "has thus set the amount of the Loss as a matter [of] law." (Doc. No. 30 at 1.) It seeks partial summary judgment to that effect and "allowing this action to proceed to trial on NashComm's claim for breach of contract, as well as its claims for extracontractual and consequential damages, without the need for proof on the amount of the Loss." (*Id.*)

NashComm's argument is this: (1) the parties agree, at a minimum, that the wind event damaged the membrane covering a portion of the Building's parapet wall; (2) its appraiser and the umpire agreed that repairing the parapet membrane requires replacement of the entire roof; and (3) under the Policy terms, an appraisal setting the amount of loss is binding on both parties, under Tennessee law. NashComm therefore asks the court to hold that the Appraisal Award is binding and enforceable. Auto-Owners responds that it is not bound by the Appraisal Award, because the appraisal panel (comprised of the two appraisers and the umpire) ("Panel") "exceeded the scope of its authority in rendering such award." (Doc. No. 41 at 1.) Specifically, it contends that the Panel erroneously made "determinations of means and methods, scope of repair, and causation" and thus exceeded the scope of its authority under Tennessee law. (*Id.* at 5.)

In its own motion, Auto-Owners seeks a ruling that "Auto-Owners has no obligation to pay the umpire's appraisal award" and, "[a]dditionally, or in the alternative," partial summary judgment that it did not breach its contractual obligations or act in bad faith. (Doc. No. 28 at 1.) The plaintiff's response essentially mirrors the arguments in support of its motion. (Doc. No. 39.)

## V.    DISCUSSION

This situation is unusual only in that, typically, appraisers assess the cost of repairing *all* of the alleged damage to an insured property—that is, the damage the insured party asserts was caused by a covered event, regardless of whether the defendant disputes coverage—without trying to parse out and assess only that part of the damage the parties *agree* was caused by a covered event. Ordinarily, then, an appraisal itemizes the damage to each part of the property, leaving it to the parties to litigate, and the court to decide, what elements of the damage were caused by a covered event and, thus, what parts of the itemized appraisal are binding on the parties.

Here, the parties did not do that. Instead, the defendant insisted—and the plaintiff agreed—that the appraisal would only pertain to that part of the damage that the defendant conceded was attributable to the wind event—the damage to a portion of the parapet wall. In rejecting the Appraisal Award, Auto-Owners does not argue that the Panel exceeded the scope of its authority by misunderstanding what part of the roof the defendant agreed was damaged. Instead, the defendant argues that the Panel exceeded the scope of its authority by reaching an issue of causation. Auto-Owners insists that no damage to the roof causing leaks was caused by the wind event, and it does not agree that damage to the parapet, *per se*, caused water incursion in other parts of the roof, including (apparently), at the joint where the parapet wall meets the flat roof.

### A.    Construing Appraisal Provisions

Tennessee law governs this diversity dispute. Under Tennessee law, "[i]nsurance contracts are subject to the same rules of construction and enforcement as apply to contracts generally." *McKimm v. Bell*, 790 S.W.2d 526, 527 (Tenn. 1990). "An insurance policy must be interpreted fairly and reasonably, giving the language its usual and ordinary meaning." *Naifeh v. Valley Forge Life Ins. Co.*, 204 S.W.3d 758, 768 (Tenn. 2006). Additionally, "insurance policies should be construed as a whole in a reasonable and logical manner." *Travelers Indem. Co. of Am. v. Moore*

& *Assocs.*, 216 S.W.3d 302, 305–06 (Tenn. 2007). Tennessee courts have long recognized the validity of appraisal provisions in insurance policies. *See Bard's Apparel Mfg., Inc. v. Bituminous Fire & Marine Ins. Co.*, 849 F.2d 245, 249 (6th Cir. 1988) (citing *Hickerson v. Ger.-Am. Ins. Co.*, 33 S.W. 1041 (Tenn. 1896)). Neither party here disputes the enforceability of appraisal provisions generally.

Tennessee courts recognize that "[a]n appraiser's authority is limited to the authority granted in the insurance policy or granted by some other express agreement of the parties." *Merrimack Mut. Fire Ins. Co. v. Batts*, 59 S.W.3d 142, 159 (Tenn. Ct. App. 2001). Typically, unless the parties agree otherwise, "the object of appraisal in cases of casualty insurance is to quantify the monetary value of a property loss[,] not to decide questions of liability." *Id.* at 152.

In *Merrimack*, for example, the appraisers selected by the parties had widely disparate estimates as to the amount of the plaintiff's loss, based on their differing views as to what damage to the insured plaintiff's house was actually traceable to the covered event—a tornado in that case. *Id.* at 146. The umpire they appointed agreed with the plaintiff's appraiser, while the defendant's appraiser protested that the other two panel members were "attempting to decide whether the policy covered certain items of damage and whether [the plaintiff's] claims might exceed the limits of her policy." *Id.* The defendant's appraiser took the position that it was the appraisers' job to "place a dollar amount on the property damage and that it was Merrimack's prerogative to determine which items of damage were covered by [the] policy." *Id.* The plaintiff's appraiser countered that "the appraisers could not intelligently determine the amount of damage without also determining whether the damage had been caused by the tornado," and the umpire agreed. *Id.* The defendant filed a declaratory judgment action, asking the court to declare that it was not bound by the appraisal award. The Tennessee Court of Appeals held that the appraisal panel's authority was confined to "determining the 'amount of the loss'" and that the panel "did not have the prerogative

to determine whether any particular loss claimed by [the insured homeowner] was caused by the tornado or whether Merrimack was ultimately liable under its policy for the loss." *Id.* at 153. The court further observed that "[t]he final responsibility for resolving disputes" over causation and liability, "assuming the parties cannot reach an agreement on their own, rests with the courts." *Id.*

Similarly, this court has recognized that, when the issue of liability is resolved, the appraisal process resolves any dispute as to the monetary amount of the loss. "However, if liability is disputed, an appraisal on the 'amount of loss' would not 'vest the appraisers with the authority to decide questions of coverage and liability.'" *Khushi P'ship v. Berkshire Hathaway Homestate Ins. Co.*, No. 3:22-cv-00265, 2023 WL 186863, at *3 (M.D. Tenn. Jan. 13, 2023) (quoting *Merrimack*, 59 S.W.3d at 152). Disputes as to coverage and liability must always be resolved by the courts, even when the amount of the loss is decided through the appraisal process. *Id.*

On the other hand, in *Thomas v. Standard Fire Ins. Co.*, No. E2015-01224-COA-R3-CV, 2016 WL 638559, at *6 (Tenn. Ct. App. Feb. 17, 2016), the Tennessee Court of Appeals affirmed summary judgment for the defendant, finding that both parties were bound by an appraisal award. There, the parties agreed that the damage in question was caused by a tornado and disagreed only as to the amount of damages. On appeal, the plaintiffs did "not suggest the appraisal was improperly conducted or [that] there were any coverage issues with the award. They simply desire[d] more money." *Id.* The court found no basis for setting aside the appraisal award. And generally, courts agree that an appraisal panel's assessment of the amount of loss is binding on the parties, even when one party contends the amount is erroneous (whether too high or too low). *See, e.g.*, *Westchester Surplus Lines Ins. Co. v. Portofino Master Homeowners Ass'n*, No. 3:23CV00453-MCR-HTC, 2025 WL 2697481, at *5 (N.D. Fla. Sept. 22, 2025) ("[M]ere errors of fact or law by an appraiser are not enough to set aside an appraisal award." (collecting cases)).

In addition, the question of *how* to conduct repairs—that is, the "scope of work" necessary to repair covered damage and the appropriate "manner and means" of repair—clearly falls within the scope of an appraisal panel's authority. *Accord, e.g.*, *State Farm Fire & Cas. Co. v. Harper*, 596 F. Supp. 3d 1032, 1038 (M.D. Tenn. 2022) (Campbell, J.). In *Harper*, there was no dispute that damage to an insured's house was caused by a tornado, a covered event, but the parties disagreed about whether the damage could be repaired or whether, instead, the house had to be demolished and rebuilt. The plaintiff sought an appraisal under the policy, but the insurance company refused to participate in the appraisal process on the grounds that the parties disputed the "scope of work" rather than merely the "amount of loss." *Id.* The court disagreed and granted the plaintiff's motion to compel an appraisal, stating:

> State Farm does not dispute that the damage to the premises is a covered loss. The only dispute is what work needs to be done to return the property to its pre-loss condition. Under these circumstances, defining the "scope of work" is inherent in determining the value of the property damages—*i.e.*, the cost to return the property to its pre-loss condition.

*Id. Accord Higgins v. State Farm Fire & Cas. Co.*, No. 22-C-198, 2022 WL 4016972, at *2 (E.D. Wis. Sept. 2, 2022) ("The parties' dispute over the cost of repair or replacement of certain items is not a coverage question but rather a factual dispute over the means and cost of correcting the damage. These are disputes over the amount of loss which, under the terms of the policy, are to be resolved by the appraisal process when either party so demands."); *Quick Response Com. Div. v. Cincinnati Ins. Co.*, No. 1:14-CV-779 GLS/DEP, 2015 WL 5306093, at *3 (N.D.N.Y. Sept. 10, 2015) (finding that a "dispute [about] the extent of work required to repair the damage caused by the fire and the necessary methods of such repair . . . are factual questions that fall squarely within the scope of the policy's appraisal clause"); *UrbCamCom/WSU I, LLC v. Lexington Ins. Co.*, No. 12-CV-15686, 2014 WL 1652201, at *5–6 (E.D. Mich. Apr. 23, 2014) (holding that a dispute regarding the necessary repairs to reopen a building and the length of time it should have taken to

make those repairs goes to the amount of loss, which falls within the ambit of an appraisal); *Williamson v. Chubb Indem. Ins. Co.*, No. 11-cv-6476, 2012 WL 760838, at *4 (E.D. Pa. Mar. 8, 2012) (concluding that a disagreement over the necessary repairs and methods of repair from a covered loss are subject to appraisal because they represent a dispute as to amount of loss, not coverage); *State Farm Lloyds v. Johnson*, 290 S.W.3d 886, 887 (Tex. 2009) ("Sometimes it may be unreasonable or even impossible to repair one part of a roof without replacing the whole. The policy provides that State Farm will pay reasonable and necessary costs to 'repair or replace' damaged property, and repair or replacement is an 'amount of loss' question for the appraisers." (footnoted citations omitted)); *Gulf Ins. Co. of Dallas v. Pappas*, 73 S.W.2d 145 (Tex. Civ. App. 1934) (holding that appraisers' determination that damages to a building caused by a fire could be repaired and the building restored to its original condition, instead of by "the complete reconstruction or replacement of the whole interior of the building," as the building owner claimed, was a decision within the scope of the appraisers' authority).

### B. The Plaintiff's Motion

The plaintiff's position in this case is that the Panel reached the Appraisal Award "through consideration of only the appropriate means and methods of repair for the damages agreed to by [Auto-Owners]" and, therefore, that the award is "binding and enforceable." (Doc. No. 31 at 15.) The plaintiff points out that both Baker and MacDiarmid testified that they did not consider causation, did not consider damages to any part of the roof with respect to which Auto-Owners contests liability, and focused only on the parapet, which the parties agreed had been damaged in the storm. NashComm also points out that Auto-Owners' Rule 30(b)(6) witness could not identify any evidence in the record suggesting that Baker or MacDiarmid considered anything other than the repairs necessary to repair the parapet which, in their view, required replacement of the entire roof.

The defendant contests the Appraisal Award on the grounds that the Appraisal Provision did not authorize the Panel to "determine means and methods or scope of repair." (Doc. No. 41 at 6.) As demonstrated by the cases cited above, however, courts universally agree that appraisal panels charged with assessing the amount of loss are authorized to decide the appropriate means and methods for repairing damages and the scope of work required. Thus, as noted in *Harper* and *Johnson*, the question of whether damage to a roof requires replacement or repair is well within an appraisal panel's purview.

Somewhat more persuasively, Auto-Owners argues that the appraisal panel improperly considered issues of causation, including the scope of damages caused by the storm.[7] This issue presents a closer call. Auto-Owners' position all along has been that the storm caused minor damage to the membrane covering of a portion of the parapet wall and that any water incursion and damage to the roof *per se* was caused by wear and tear and/or poor maintenance. (*See* Doc. No. 41 at 10 ("Owners also stated [in its August 8, 2023 letter to NashComm that] the parapet wall damage 'is repairable and does not affect the functionality of the roof system.'"); Doc. No. 32-3 at 2–3, Def.'s Answer to Pl.'s Interrog. No. 10 (referencing Auto-Owners' engineer's finding that any "water intrusion through the roof was due to general aging of the roof membrane and failing sealant, which resulted in widespread deterioration-related openings throughout the roof surface and was not attributable to wind or hail").) As evidence that the Panel improperly considered causation, Auto-Owners points to MacDiarmid's email to the other Panel members, explaining that he considered "the 2 areas which had agreed wind damage and were allowing water intrusion

---

[7] Auto-Owners does itself no favor by asserting—with no basis in fact—that "the members of the Panel signing the award admitted that the only damage to the roof was this area of the parapet wall." (Doc. No. 41 at 3.) Auto-Owners' record citations do not support this statement. Moreover, as set forth above, the record is clear that Baker and MacDiarmid were attempting to confine their appraisals to that part of the roof that *Auto-Owners* agreed was damaged by the wind event. (*See* (Doc. No. 32-5, MacDiarmid Decl. ¶ 5; Doc. No. 38-2 at 3, Baker Dep. 23.)

to the interior." (Doc. No. 33-11.) As the plaintiff points out, however, MacDiarmid's full explanation establishes that he was focused on repair rather than causation: "After the thermography report, it was very clear that the areas at the agreed wind damage were indeed wet and with the current condition of the roof, attempted repairs would lead to a domino effect of damaging the surrounding materials while attempting to manipulate." (*Id.*) In other words, the wet areas around the damaged area established for MacDiarmid that replacement of the roof as a whole was required in order to effectively address the damage to the parapet. And both MacDiarmid and Baker disavow having considered anything other than damage to the area of the roof that the defendant agreed had been caused by the wind event. They accepted as a given that the damage to the parapet wall expressly admitted by Auto-Owners was caused by the wind event, and the defendant has presented no evidence that the Panel went beyond that express limitation in computing damages.[8]

As already stated, the law is clear that it is well within an appraisal panel's job description to assess the appropriate manner and means of repair in appraising the cost to repair a loss. Here, the panel appears to have done just that: it was tasked with determining the appropriate means of repairing the admitted damage to the parapet wall, and it determined that replacement of the roof as a whole is required in order to correctly remediate the damage admittedly caused by the storm. The factual circumstances are effectively the same as those presented in *Harper* and *Johnson*. In each of those cases, the parties agreed that the entire roof had been damaged by a covered event

---

[8] Even if they tangentially considered causation, "appraisers must always consider causation, at least as an initial matter. An appraisal is for damages caused by a specific occurrence . . . . Any appraisal necessarily includes some causation element, because setting the 'amount of loss' requires appraisers to decide between damages for which coverage is claimed from damages caused by everything else." *Johnson*, 290 S.W.3d at 893; *see also Hill v. Auto-Owners (Mut.) Ins. Co.*, No. 4:19-cv-78, 2020 WL 7034321, at *10 (E.D. Tenn. Nov. 30 2020) ("[P]ractically speaking, it would be difficult to completely divorce causation and coverage findings from an appraised loss.").

but disagreed as to the best means of repairing it. Here, the parties agree (for purposes of summary judgment) that the parapet wall was damaged and disagree as to the appropriate manner and means of repairing that damage. MacDiarmid attests that his "determination of the amount of the loss" was based "only the scope of damage that Owners agreed had sustained damage, and [he] determined the necessary means and methods of repairing the same." (Doc. No. 32-5, MacDiarmid Decl. ¶ 5.) Moreover, even if MacDiarmid is wrong as a factual matter about whether repairing the parapet requires replacement of the entire roof to return the property to its pre-loss condition, this is a risk the parties accepted when they agreed to an appraisal procedure in the Policy. *Accord Westchester Surplus Lines Ins. Co.*, 2025 WL 2697481, at *5 ("So, when parties run to the courts following an appraisal and complain that an award is supernaturally high or riddled with duplicative costs, judges generally react with a shoulder shrug—after all, this is the process the parties knowingly bargained for, and appraisers are often better equipped to measure these sorts of damages.").

Finally, regarding Auto-Owners' protests about the condition of the roof, wear and tear is simply part of the consideration an appraisal panel takes into account in appraising a loss. *See Johnson*, 290 S.W.3d at 892–93 ("If State Farm is correct that appraisers can never allocate damages between covered and excluded perils, then appraisals can never assess hail damage unless a roof is brand new. That would render appraisal clauses largely inoperative, a construction we must avoid." (footnoted citations omitted)). Indeed, the depreciation assessed as part of the Appraisal Award likely took into account the age and state of the roof at the time of the wind event.

As discussed above, an appraisal panel's authority is "limited to the authority granted in the insurance policy or granted by some other express agreement of the parties." *Artist Bldg. Partners v. Auto-Owners Mut. Ins. Co.*, 435 S.W. 3d 202, 217 (Tenn. Ct. App. 2013) (quoting *Merrimack*, 59 S.W.3d at 152). An appraisal award made in accordance with an appraisal provision

of an insurance contract is binding and enforceable, and "courts will indulge every reasonable presumption to sustain an appraisal award." *Beaty v. Homeowners of Am. Ins. Co.*, No. 01-23-00844-CV, 2025 WL 2446008, at *4 (Tex. App. Aug. 26, 2025) (citing *Zhu v. First Cmty. Ins. Co.*, 543 S.W.3d 428, 433 (Tex. Ct. App. 2018)). Auto-Owners has failed to show that the Panel exceeded the authority granted by the Policy and limited by the parties' express agreement. The court therefore finds that the Appraisal Award is enforceable. The plaintiff's Motion for Partial Summary Judgment will be granted, thus "setting the amount of the Loss as a matter of law." (Doc. No. 30 at 1.)

### C. The Defendant's Motion

Auto-Owners seeks partial summary judgment that it has no obligation to pay the Appraisal Award, or, in the alternative, a ruling that Auto-Owners did not act in bad faith under its insuring agreement with NashComm by contesting and refusing to pay the Appraisal Award. The court's determination that NashComm is entitled to a judgment that the Appraisal Award is binding and enforceable requires the denial of Auto-Owner's request for a judgment in its favor on that issue.[9] However, the court must consider Auto-Owners' alternative argument that is entitled to partial summary judgment on the issue of whether it acted in bad faith.

To recover for bad faith under Tenn. Code Ann. § 56-7-105, NashComm must prove that (1) the Policy, by its terms, has become due and payable; (2) NashComm made a formal demand for payment; (3) it waited 60 days after making demand before filing suit (unless there was a refusal to pay prior to the expiration of the 60 days); and (4) the refusal to pay was not in good

---

[9] Even if the court had not ruled in the plaintiff's favor on this issue, summary judgment in favor of the defendant would not be warranted, as there is clearly a factual dispute as to whether the wind event damaged the roof as a whole and caused the leaks at issue. This dispute is no longer material, but only because affirming the Appraisal Award effectively moots it.

faith. *Ginn v. Am. Heritage Life Ins. Co.*, 173 S.W.3d 433, 443 (Tenn. Ct. App. 2004) (citations omitted). The burden of proving bad faith lies with the plaintiff. *Id.*

"The bad faith penalty is not recoverable in every refusal of an insurance company to pay a loss. An insurance company is entitled to rely upon available defenses and refuse payment if there is substantial legal grounds that the policy does not afford coverage for the alleged loss. If an insurance company unsuccessfully asserts a defense and the defense was made in good faith, the statute does not permit the (sic) imposing of the bad faith penalty." *Id.* (alteration in original) (quoting *Sisk v. Valley Forge Ins. Co.*, 640 S.W.2d 844, 852 (Tenn. Ct. App. 1982)).

In this case, the only disputed element of the plaintiff's bad faith claim is whether Auto-Owners' refusal to pay was in bad faith. NashComm insists that it was—or that there is at least a jury question as to Auto-Owners' good faith. To be clear, NashComm does not appear to contend that Auto-Owners' initial investigation of the claim and assessment of the damage were in bad faith. Instead, NashComm argues that, once Auto-Owners agreed to an appraisal, it had no legitimate basis for contesting the enforceability of the Appraisal Award. NashComm asserts that Auto-Owners admittedly raised exclusions and limitations that have no relevance in this case and that, despite its contention that the Panel improperly considered causation, its Rule 30(b)(6) witness effectively admitted during his deposition that he could not point to any evidence in the record supporting that contention. The plaintiff also emphasizes that Auto-Owners' appraiser testified that determining the appropriate manner and means of repair was part of the Panel's job.

The court finds that there is insufficient proof of bad faith in this case. On a motion for summary judgment, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson*, 477 U.S. at 255. However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Id.* at 252. "There must be evidence on which the jury could reasonably find

for the [nonmoving party]." *Id.* The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id.* Here, although the court has found that Auto-Owners' defense and objections to the Appraisal Award are without merit, Auto-Owners has maintained from the beginning that the damage to the majority of the roof was caused by the condition of the roof and not the wind event. It has an engineer's report supporting its position as to causation, and its appraiser's opinion regarding the cost to repair the parapet was that the "interior water intrusion was not coincident with the aforementioned displaced membrane or displaced metal joint covering the parapet wall" and that "the parapet covering . . . is rather insignificant to the roof itself." (Doc. No. 33-12.) That is, Auto-Owners had "substantial legal grounds," *Ginn*, 173 S.W.3d at 443, for arguing that the Panel exceeded its authority in assessing damages by improperly considering causation. The evidence in the record— including that Auto-Owners' denial letter asserted limitations and exclusions that clearly do not apply—is not sufficient to permit a reasonable jury to conclude that Auto-Owners acted in bad faith in objecting to the Appraisal Award.

The defendant's Motion for Partial Summary Judgment in its favor will be granted, insofar as it seeks a judgment that the plaintiff will not be entitled to recover under the Tennessee bad faith statute, Tenn. Code Ann. § 56-7-105(a).[10]

## VI.    CONCLUSION

For the reasons set forth herein, the plaintiff's motion (Doc. No. 30), seeking judgment that the Appraisal Award is binding and enforceable as to the amount of Loss, will be granted. The defendant's motion (Doc. No. 28) will be denied, insofar as it seeks a judgment setting aside the

---

[10] The court will not address the issue of punitive damages, which was raised only in the plaintiff's Response to Auto-Owners' Motion for Partial Summary Judgment and not in Auto-Owners' motion.

Appraisal Award as outside the scope of the appraisal panel's authority, and granted, insofar as it seeks a judgment that the plaintiff has not established that the defendant's refusal to pay the Appraisal Award is in bad faith.

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge